Thank you. Please, the Court. My name is Mike Miller. I'm here representing the plaintiffs. I don't know that I have 15 minutes of argument. You don't have to use them. Thank you. As the Court knows, this is a Sheeran summary judgment. A mother, on behalf of herself and her two children, filed an action against both the state employee and the sheriff's office for taking the child out of school, out of the classroom, subjecting her to a two-hour custodial interrogation. It's my position in this that it's basically along the lines of, I guess, a mental and verbal rubber hosing of this child. That's a piece of it, and then the other piece of it has to do with medical examination. That's correct. And then the third piece of it has to do with the representations made to the family courts. Yes. I basically had three points in my brief that I focused on. One, that the seizure of the child from the classroom subjected to custodial interrogation. The removal of the child. Do we have any, is there any Ninth Circuit case law on the, what you're calling the seizure of the child from the classroom, where the child was not a suspect in anything? The child was essentially a witness or a victim. Is there any applicable case law at all in this Court? I was not able to find any. All right. So then other courts, there's some case law I know in the Seventh Circuit. Correct. I cited the one case I was able to find out of everything about saying that it was a seizure and an unreasonable seizure to take a child from a private school. We talked somewhat about the private school being a situation where the parents had therefore expressed some kind of a desire to keep the child away from public access, I guess. My belief in this situation, though, that every child should be entitled to the exact same kind of protection, the Fourth Amendment and the Fourteenth Amendment. They either protect you or they don't protect you. There's also another Seventh Circuit case that suggests that it's the Terry standard. And I guess I have some questions about that, basically, too. One is, again, this child was not a suspect. So ordinarily, Terry doesn't apply to witnesses. You can't go stopping witnesses, as I understand it. But secondly, Terry may state the standard for taking the child to begin with, but it also talks about the other question is what happens next. And this child claims that she was there for two hours with a policeman present. So is that – if we apply Terry, how does the case come out? Well, Your Honor, and that's the argument I make. I guess it's twofold. One, I believe the seizure of the child in the first place was not reasonable. Because? If you look – well, in Judge Aiken's decision, she talks about it being justified because there is a report, I believe that's information suggesting that the two children had been abused by their father, and the plaintiff had knowledge of this abuse. If there's no cite to this information other than Mr. Cameron's affidavit where he says I received a report from the Chutes County Sheriff's Office saying Well, wait a minute. Wasn't Nimrod Green charged for abuse of a seven-year-old child, number one? Number two, wasn't Mr. Camerota – didn't he give an affidavit that given his experience when a parent abuses child X, it is likely the parent is abusing his own children, and therefore he wanted to find out what was happening to S.G. in the classroom right away? Why isn't that – when we're talking about reasonable, it doesn't mean that we have to be convinced at this point that Camerota was right. We have to be convinced that he had a reason for taking the action he did, and don't those two things add up to a reason? Well, certainly that's his argument, but I don't believe him simply having a reason justifies violation of the Fourth and Fourteenth Amendments. Well, but you're begging the question. If he has a reason, then it isn't a violation of the Fourteenth Amendment. Well, I think the reason has to be based on some facts. Well, the fact was Nimrod was charged with abusing a seven-year-old boy, right? He was accused of that. Knowing that, then he wants to talk to Nimrod's daughter to see if she's being abused by the parent. Isn't that a pretty good reason? I don't believe it's sufficient reason to seize the child. What is sufficient reason? Does he have to have a videotape? Well, I think he needs to – I think he needs to go to a court and see if it – It doesn't matter at all. It seems to me that the overall reasonableness of this depends on what was done. And what was done here was this child was taken to a room without anybody she knew, without a teacher in the room or her parent, and she was – and a policeman present. Suppose some of those circumstances weren't there. Suppose that they had gone in and had her teacher who she trusted sit in on this interview. Would that make a difference? Well, I believe it would affect the reasonableness. I think more importantly would be the time involved in this. Right. It's where I find most – Okay, so suppose it was a 10-minute conversation with a teacher present. I mean, this is sort of responsive to the kinds of questions Judge Bay is asking. I mean, this is ultimately – if it's ultimately a reasonableness question, then exactly what happened matters. And under Terry, exactly what happened matters. Ordinarily under Terry, if you're applying Terry, you don't get to talk to somebody in a closed room with a policeman for two hours under Terry, usually. So the question is – and she testified it was two hours. The officer says it was one hour, but there is evidence in the summary judgment record that it was two hours. Correct. So you're taking a fairly extreme position, which is that they had to go get a warrant. But let's assume if they didn't have to go get a warrant, what would have made this reasonable? Well, Your Honor, or they could have gone to the home when the mother was there and spoken to this child at the time with the mother present. There are other circumstances that they could have found in addition to getting a warrant. They could have gone and sought consent from the parent. There's no evidence that the mother wants the children to be abused, that the mother would have interfered with them doing so. They could have gone to the home. Well, there's some evidence later on that the mother was coaching the daughter not to talk about there being any sexual abuse by Father Nimrod. Of course, a friend, a comrade, didn't know that at that time. And I believe there's conflicting evidence. I believe that's the spin that the State wants to put on whatever they're saying. You keep talking about spin and argument, but unfortunately for you, there's some facts in the record which are not spin and are not argument. I understand that. That's my position, is that we should have had an opportunity to go to trial on this matter. But I believe that the evidence was not sufficient. I think Judge Berzon has hit on the important part of that school interrogation. Was it reasonable under Terry, which as I remember it was a stop-and-frisk case, to rely on Terry for a one- or two-hour examination of the child alone without anyone but the investigator? And a policeman with a gun. Correct. I mean, Terry doesn't allow them to even remove the person. I believe they can stop the person where they are and discuss and ask them questions, but they can't take them anywhere from that point. And that's, I mean, how do you say it? There are some Terry cases that push a limit. Some do have them taken to places. But I don't know of any offhand in which you have somebody being interrogated in a closed room for two hours, besides which this person was a witness, not a suspect. All right, so let's move beyond this issue and go to the question of the presence or the refusal to let the mother be present at the medical examination. Again, Your Honor, that relies on the statements in Wallace v. Spencer, which I cited in my brief, the section where Wallace says that. What does the district court judge say about Wallace? I don't have that in here in front of me, Your Honor. I don't believe she actually addressed the issue of the reasonableness of that. I think she said that the State had the ability to do so, and that therefore There's some argument of, I'll say she does, what she says is, Plaintiff received due process of law because they were removed from her custody, and she was given the opportunity to be heard at the custody hearing. But not on the question of whether or not they could do an exam without her. Was that ordered by the court? Did the court order that? That the mother not be there? Yes. No. No. No. But now, in Wallace, we had a fifth parent without any question. Here we have a mother who had been told by the court not to discuss this case with her daughter. And the evidence appears to be, document 44, that she had been discussing in violation of what she had been told to do. In other words, she was coaching her daughter, don't rat out Nimrod. That's what she was saying. Now, does that make her a fifth parent under Wallace? Well, I'd say we – I believe the parent's affidavit in here contradicts that statement, that she in fact did not make those statements and did not do that. Well, that's an issue of fact. Right. Right. And I believe it should be – But the question is, was Camerata reasonable in getting that kid's examination prevention presence as to the mother? Okay. Was he – who was responsible for that decision? To not let the mother be present? That was Mr. Camerata. He accepted it. His, or was that just the policy of this center? Did he work for this center? No. Mr. Camerata worked – is a DHS worker for the State. Another question is, did Mr. Camerata work – he did not work for the court. Is that right? Was that a court employee? No. And there's some argument with regard to absolute immunity for this determination of not – decision of not allowing the mother present because it was carrying out a court order. But he did not – he didn't work for the court, and the court hadn't ordered this. Right? That's correct. That's correct. And regarding the second issue, regarding the removal of the children from the home, I've since found several cases in other jurisdictions which I think actually are contrary to what my position was on that, but I think Mr. Camerata probably does have absolute immunity for lying in his – at the shelter care order hearing. So I did want to just – For lying where? In the hearing? When he went to the shelter care – or when he went to the shelter care hearing with the court, and the court was considering the issue of returning the children to the mother, and Mr. Camerata stood up there and gave reasons to the court. Well, we have a non-bank opinion that came out a month ago. Beltran, as you know, I assume. Well, that may be one of the ones I've read. I didn't cite to it, but I know there have been several decisions that have come down contrary to what I've been trying to argue on that issue. But I think the issue of the examination, I think these children clearly needed their mother there. The mother certainly wanted to be there. The mother went to the kid center specifically to attend these examinations and was ordered by Bob Camerata to leave the facility. Could you please speak in the microphone? I'm sorry. You've got a very light voice as far as I'm concerned. The kid center was actually part of this lawsuit, was dismissed by Judge Aikens after Mr. Camerata accepted responsibility for being the one to order the children to leave the center. I see. You can reserve a time if you like. Thank you. It would be helpful if you told us how the defense counsel are dividing up time. Yes, Your Honor. May it please the Court, I am Dave Thompson. I'm representing Bob Camerata, the State caseworker, and I'm assuming that we are simply going to split the time five minutes apiece. Okay. Watch your own time then. All right. Thank you. To begin with the absolute immunity question, Your Honor, I did discover the Beltran v. Santa Clara County case in reading over the cases that I had cited to the Court with respect to absolute immunity. There is no analysis from the plaintiff on the absolute immunity question. Mr. McCarthy, which time period are you talking about? Are you talking about the removal of the children from the home or are you talking about the carrying out of the order with regard to the examination? Good point. The absolute immunity ruling appears to be attached to the ruling or to the removal of the children from the home, and that was done pursuant to court order. That doesn't seem to be inconsistent with this Court's decision. I mean, after the fact, after the order. Right. Yes, but I don't understand it there to be an issue about the removal, but I thought the issue was about the examination, and the examination was not the preclusion of the mother from being at the examination was not a court order. No, and I agree with that, and that's where it's not absolutely clear what the district court did with respect to immunity. It ruled on immunity. It's not clear whether it was talking about absolute immunity or whether it was talking about qualified immunity. Well, how could there be qualified immunity in light of the Wallace case? It would have to be, Your Honor. How could there be in light of the Wallace case? The ‑‑ I don't think Wallace is directly on point here in the sense that ‑‑ Because? Well, in the sense that you have State laws that were being followed by Camretta in excluding the mother from that medical examination. Specifically, it gives a caseworker like Camretta the discretion to exclude a parent if the caseworker reasonably believes that the parent may interfere with the examination or the interview. And I think that's what was going on here. It wasn't just an interview. It was also a physical examination of a new child with photographs and scopes. And I'm not sure how she even would interfere with that, but in any event, that seems to kick things up to an entirely different level than an interview. I agree. It does change the landscape a bit. And the question is, I think ultimately whether a reasonable caseworker in Camretta's position when confronted with those facts and doing what he did with respect to the mother. Well, give me one reason why it was reasonable. What evidence did he have that made that reasonable? The evidence that made that reasonable was that the mother clearly was not cooperating with the investigation. Yes, but in order to think that she was going to interfere with the exam. Let's leave the interview aside. You'd have to think she was going to go there and grab somebody's hand. Did she have any reason to think that she was in any way, you know, out of control or likely to not follow orders or if she was told to go stand in the corner and not say anything, she wouldn't do it? Well, that may be true. That may be true that this record is thin on those kinds of facts. I can't point you to anything that specific. All that I can point you to is a concern with a general attitude on the part of the mother in interfering with the investigation of possible sexual abuse of her daughter. The countervailing situation being you were dealing with a 6-year-old and a 9-year-old who, as far as anybody knew, were close to their mother, did care for their mothers and would be comforted by their mothers. And Wallace seems to be dealing in exactly that concern with regard to the right of the parent to be present during an intrusive medical examination, which this was. It all comes down to whether or not there's adequate facts in the record to have raised a sufficient concern on the part of the caseworker to have excluded the parent from that medical exam. And I'll concede it's a very close question. I'll have to concede that. If there are no additional questions with respect to ‑‑ And just to clarify something, you're not arguing for absolute immunity as to that episode? No. Okay. I don't think the district court went there either. So I'm not. I think qualified immunity, the quote, immunity from the district court's decision must have been qualified immunity. Okay. Thank you. I see that I'm about out of time if I'm reading this ‑‑ Thank you, Harry. I won't do to you what was done to me in my first oral argument when I was actually not late but appeared to be. But it's better to get here on time. My apologies, Your Honor. I was coming from central Oregon and just not familiar with Portland. So may it please the Court, my name is Chris Bell. I'm here on behalf of Parties Deschutes County and Deputy Alford. And I would like to just make a few comments. The first being I'd like ‑‑ Was this deputy the deputy who was at the school? Yes, who sat and basically observed the interview conducted by Mr. Camrata. And that's kind of the point I really would like to stress here and it is for you all to consider this from the side of Deputy Alford. In this case, it's my understanding that Deschutes County is not being put to task, is not being sued anymore in that there's no argument for municipal liability. There's certainly been no evidence presented as far as whether or not Deschutes County had any policies or customs that caused the alleged constitutional violation to occur. And so this is solely a case involving the conduct of Deputy Alford. In this case, as the evidence showed, Deputy Alford was basically dispatched to this interview and sat there. Didn't ask any questions. There's really no evidence that he even ‑‑ But what was his function? I mean, there were two possibilities. One is that he was asserting authority essentially and helping to frighten the child to some degree. That could either have been intentional or not intentional. And the second is that it was part of an investigation of the father and he was participating in that. But in any event, he was present showing force and authority as a law enforcement officer with a nine-year-old child in a room for two hours when she wasn't suspected of anything. Sure. So what justifies that? Well, I think what justifies that is the second case, that there was an ongoing law enforcement operation that was investigated. All right. Could he come to my house and say, you know, I think somebody beat you up and I'm going to take you to the police and I'm going to sit you down for two hours and talk to you even if I don't want to talk to them? No. But I think case on the Ninth Circuit and elsewhere demonstrates that your right to privacy in a private home is different. All right. Could he come to my courtroom and do that? Could he come to the courthouse and come to my office and say, you know, I hear somebody beat you up and I want to talk to you when you sit here and I'm going to talk to you for two hours whether you want to or not? Could he do that? Well, I think there's an essential difference in that this was a young girl suspected of sexual abuse by her father, whereas you are an adult who arguably can protect yourself and you don't have an authority over you, i.e., a school. Well, so shouldn't there be somebody there who was an advocate for the child, precisely because she's a child? There was nobody who was there on behalf of the child. Well, I think the police officer not only had investigatory responsibilities, but he also had responsibilities to observe and make sure that Mr. Camaretta didn't attempt to do anything outside of the ordinary, didn't attempt to harass the child. I think that is one of the functions of him being there as a peace officer is to observe and be a witness. All right, so let's assume the rest of it. How does it affect you to stay there for two hours in a closed room? Sure, I'm sorry, I'm jumping in. What gets you there for two hours is, number one, the information that Mr. Camaretta and by extension Mr. Alford had before the interview, i.e., a seven-year-old boy who very credibly testified or told the police officer that Nimrod Green had abused him and also the evidence from the parents. Do you know of any Terry case that would justify with nothing, let's assume there was reasonable suspicion, leaving aside the fact that this person was not a suspect, would justify a two-hour interrogation in a closed room with a policeman with a gun? I think there are cases. I've said it in here. I don't think they go as far as two hours, but I think there was a case involving a ten-minute interrogation. I think there were some other cases involving a little bit longer interrogations. But I also think that during this interview at some point the youth in this case, S.G., made statements that were very incriminating. She, in fact, acknowledged. They weren't incriminating her. Excuse me again? They were not incriminating her. Usually Terry runs against people who have themselves respected or something. Sure, but I also think that the TLO line of cases suggests that when a youth comes into a facility and there is some reason to suspect either that the youth in those. This also had nothing to do with school, nothing to do with the school's interest in discipline and it wasn't instigated by the school. It's not just discipline, though. I would argue it's not just discipline. It's the safety and the well-being of the children that those cases talk about. They don't just talk about discipline. They talk about their duties as institutions having care of these children and ensuring their safety. In fact, I think I specifically quoted some language from some of those cases where they specifically say that. Do you think the distinction between a public school and a private school makes any sense? Personally, no. I think the function is the same. I think if I recall correctly that line of case came out of another circuit. But, no, I don't. I think that the function is the same. I sort of see why the courts that came to those decisions came to them, but I just don't see the distinction, really. Whether it's private or public, they're serving the same purpose, although a public school obviously has supposedly the machinations of the government behind it a little bit more, perhaps, than a private school would. But I still, the purpose, the policy behind being able to allow interviews such as this is the same, and that's protection of the child. Also, in this instance, was the school even consenting? Did the school have the authority to consent? Was there anybody in the school who was responsible here? I think that would probably be better answered by the school, but I believe there was testimony from Deputy Alford that they talked to school administration and did receive permission from school administration before that. Well, your time is up if you're going to listen to this. Thank you for your argument. May it please the Court, Janet Schreier on behalf of the Ben Lapine School District as well as Ms. Friesen. First, I want to say what's not at issue in this appeal, and the school district was sued in its municipal liability capacity, and plaintiff has not briefed or made any arguments about the custom and policy issue in the opening brief. And consequently, that issue was waived, so we believe that the school district's summary judgment ought to be affirmed because plaintiff has not advocated for a reversal in this court. Also, the claim against Ms. Friesen in plaintiff's complaint is solely in an official capacity. The excerpt of record, page 3, paragraph 6 of the complaint, and an official capacity claim is one that is essentially the same as the one against the school district. That's the real party in interest, again, because they didn't challenge the school district's summary judgment. We believe the summary judgment for that reason alone as to Friesen ought to be affirmed. Then the only other issue would be the individual liability, and that's talking about the issues that you've talked about here in the Fourth Amendment seizure issue. And the trial court found both on the basis of no constitutional violation as well as on the qualified immunity issue that the Friesen was entitled to summary judgment. And we think both reasons pertain.  She didn't have any control over what was going to happen after this child was handed over to the social worker. Correct. And she – what my understanding of the record is that the school was notified that they were there to do the interview, and the regs provide that the investigators must notify the school, but it doesn't give the school a decision whether they ought to or ought not allow the interview. They simply have a duty to facilitate the interview, and that's what happened here. And we think the fact that the statutes and regs permit the school or require the school to cooperate here goes to both whether it's reasonable what happened. The school didn't instigate anything here, right? Correct. No. They simply facilitated the interview, and the only involvement of Ms. Friesen was to go to the classroom and get the girl out of her class, bring her to the place where the investigators were, and that's where she left the girl. And it was a brief period of time. She wasn't in the room with them. She didn't remain in the room with them. It wasn't her place to remain in the room with them. And so her timeframe and her involvement, whether you find the two hours too long or not too long, Ms. Friesen's involvement was simply to facilitate the interview that Oregon rules and regs permit and, in fact, require under these circumstances, I think. And Oregon rules and regs don't provide for there being a teacher or a school official in the room when outsiders talk to their students? No, they don't. As I was sitting here waiting for my turn to argue, I looked at page 16 of our brief where the reg in question permitting the interview process. It says, The school administrator or a school staff member designated by the administrator may, at the investigator's discretion, be present to facilitate the investigation. So it's not only not required, but it's only permitted when the investigator in his discretion wants them to be there. And there's no evidence in the record that there was any such request here. I think it's important that the plaintiff has not challenged the rules and regs in question, their constitutionality. Yes, he's saying what the conduct was unconstitutional. Well, it doesn't really matter. I mean, we don't need to deal with them facially, but he's eventually saying to the degree they allowed this to happen, if they allowed this to happen, they're invalid. But he hasn't actually made that argument. And I think that's important for the purpose of the Fourth Amendment analysis because he's not challenging the underlying regs under which all these people were working. Even if he was, however. Well, it may be relevant to the Qualified Immunity Analysis. I don't see why it's relevant to the Fourth Amendment analysis. That's just what I was going to say. My time is almost up. But they certainly are relevant to the Qualified Immunity because they've never been held unconstitutional before. And consequently, all these defendants had a right to rely on that as being the law and what they were required and permitted to do. And in order to get around Qualified Immunity, plaintiff has to show that these defendants violated clearly established rights. And not only were they not clearly established, but what they were doing was permitted by the law.  Thank you very much. Thank you, counsel. Do we have any rebuttal? Thank you very much. Thank you, counsel. The case of Green v. Camreta is submitted. And I'll go on to select metrics versus etch rating.
judges: Berzon, Bea, Gutierrez